Blythe v. Bell, 2012 NCBC 60.

STATE OF NORTH CAROLINA

COUNTY OF CATAWBA

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
11 CVS 933

WILLIAM A. B. BLYTHE (individually
and in his capacity as shareholder) and
DRYMAX SPORTS, LLC,

      Plaintiffs,

      v.

ROBERT E. BELL III, VIRGINIA
BELL, NISSAN JOSEPH, and
HICKORY BRANDS, INC.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT**

{1}     THIS MATTER is before the court on cross-motions for summary judgment on the limited issue of the present ownership and status of membership interests in Drymax Sports, LLC ("Drymax").

*Moore & Van Allen, PLLC by James P. McLoughlin, Jr., Mark A. Nebrig, Benjamin P. Fryer, Frank E. Schall, and Christopher D. Tomlinson for Plaintiffs William A. B. Blythe and Drymax Sports, LLC.*

*Ellis & Winters, LLP by Andrew S. Chamberlin and C. Scott Meyers, and Young, Morphis, Bach & Taylor, LLP by Paul E. Culpepper and Kevin C. McIntosh for Defendants Robert E. Bell III, Virginia Bell, Nissan Joseph, and Hickory Brands, Inc.*

Gale, Judge.

## I. INTRODUCTION AND SUMMARY OF RULING

{2}     This litigation involves disputes relating to the ownership, management, and operation of Drymax, a North Carolina limited liability company ("LLC").  Drymax was formed in 2003, following an earlier business venture between Plaintiff William A. B. Blythe ("Blythe") and Hickory Brands, Inc. ("HBI") for the sale of socks using a proprietary technology affording desirable stay dry properties.  How the opportunities, expenses, and revenues were to be shared in pursuing that venture is much disputed, but is not the subject of this present Order.  When Drymax was formed, Nissan Joseph ("Joseph") was HBI's President, and Robert E. Bell III ("Rob Bell") and Virginia Bell were HBI shareholders and officers.  The original members of Drymax were Blythe and Defendants HBI, Joseph, Rob Bell, and Virginia Bell.

{3}     In 2007, HBI assigned its minority interest in equal parts to existing members Rob Bell and Virginia Bell.  In 2008, Joseph assigned his minority interest to HBI.  Neither of these assignments were approved by a member vote or writing signed by all members.

{4}     The Parties agree that these assignments were effective without the need for unanimous consent to transfer the assignor's economic or distributive interests.  They disagree as to the impact of the assignment on the assigning member's right to vote or participate in management (collectively referred to in this Order as a member's "control interest").  The competing positions determine whether Blythe has achieved de facto majority control by reason of the assignments even though he owns only a minority share.

{5}     There is no enforceable Operating Agreement, so that the issue is determined by the default provisions of the North Carolina Limited Liability Company Act (the "Act").[1]  The court does not by this Order address what impact, if

---

[1] The court's ruling is based on the Act's default provisions and does not adversely limit the Act's grant of authority to members to modify the relevant default provisions by articles of incorporation or by an operating agreement.

any, any control changes had on past corporate acts, such as, for example, whether any transaction was a conflict of interest transaction requiring special approval procedures.

{6} The issues are ones of first impression in North Carolina. For the reasons discussed below, the court holds that, in the absence of articles of incorporation or an operating agreement to the contrary: 1) the assignment of control interests between members is effective without unanimous member consent; 2) therefore, HBI's assignment to Rob Bell and Virginia Bell was effective upon assignment to transfer both HBI's economic and control interests, causing HBI to cease being a member; 3) the assignment of a member's interest to a non-member does not transfer a control interest until there is unanimous consent expressed by admitting the assignee as a member, and the assignor retains his control interest pending that admission; 4) HBI was no longer a member when Joseph assigned his interest, therefore HBI received only Joseph's economic interest and Joseph has retained his control interest.

## II. PROCEDURAL HISTORY

{7} Other procedural history of the litigation is summarized in this Court's July 26, 2012 Order on Motion for Order Compelling Return of Privileged Documents. The court here recites only the procedural history relevant to the current cross-motions.

{8} Plaintiffs filed their Complaint in Catawba County Superior Court on March 22, 2011, and their Amended Complaint on July 28, 2011, asserting numerous direct and derivative causes of action arising out of disputes over the internal governance and management of Drymax, including whether revenues and business opportunities have been improperly diverted from Drymax to HBI.

{9} Following the completion of discovery,[2] on October 9, 2012 both Parties timely filed summary judgment motions. Plaintiffs' Motion for Partial Summary

---

[2] Plaintiffs have now moved to reopen discovery on limited issues not relevant to this Order.

Judgment and Defendants' Motion for Summary Judgment as to Blythe's claims[3] each invited the court's determination of the effect of the assignments as a matter of law based on the uncontested facts. This Order is limited to that single issue, and other issues presented by the respective motions will be the subjects of a subsequent ruling. The issue presently before the court has been fully briefed, argued, and is ripe for adjudication.

## III. STATEMENT OF RELEVANT FACTS

{10} The court does not make findings of fact when ruling on a motion for summary judgment. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 215 S.E.2d 162 (1975). The court here recites those facts material to its present ruling and which it believes are uncontested.

## A. The Parties

{11} Drymax is a North Carolina limited liability company. (Am. Compl. ¶ 1.)

{12} Blythe is a California citizen and resident and has been a member of Drymax since its inception. (Am. Compl. ¶¶ 4–6.)

{13} HBI is a North Carolina corporation with its principal place of business in Catawba County. (Am. Compl. ¶¶ 19–20.)

{14} Rob Bell is a North Carolina citizen and resident and an original member of Drymax, as well as an owner and officer of HBI. (Am. Compl. ¶¶ 12–15.)

{15} Virginia Bell is a South Carolina citizen and resident and an original member of Drymax as well as an owner and officer of HBI. (Am. Compl. ¶¶ 16–18.)

---

[3] Defendants filed a separate summary judgment motion as to Drymax's claim. This Order does not address that motion.

{16}   Joseph is a North Carolina citizen and resident and an original member of Drymax.  He was the president and chief executive officer of HBI from May 2003 until January 2008.  (Am. Compl. ¶ 24.)

## B.   Drymax's Formation

{17}   Blythe founded SecondWind Products, Inc. ("SecondWind").  In 2001, Blythe sold most of SecondWind's assets to HBI (the "Asset Purchase Agreement"), which was then controlled by R.E. Bell II, the father of Rob Bell and Virginia Bell.  (Blythe Dep. 65:12–66:2.)  As part of the Asset Purchase Agreement, HBI entered into a license agreement (the "License Agreement") with SecondWind and Dan Talbott to sell socks using SecondWind's trademarks "Active Dry," "Drymax," and "MicroZap."  (Blythe Aff. 2, Oct. 25, 2012; Blythe Dep. 516:20–517:9; Blythe Dep. Ex. 130.)

{18}   In 2003, Blythe indicated his intent to terminate the License Agreement.  (Blythe Aff. 2, Oct. 25, 2012.)  R.E. Bell II then requested that Blythe discuss a new venture with Joseph.  (Blythe Dep. Vol. I 95:19–25, 96:1–25, 97:1–17.)  The exact nature of the agreements ultimately reached are disputed, but in general HBI was to provide operational services and initial capital and Blythe would provide product, packaging and sales services.

{19}   R.E. Bell II and his wife died in a plane crash before any venture was formalized.  Rob Bell and Virginia Bell became the majority owners and officers of HBI (Virginia Bell Dep. 11:6–7, 25:5–12) with Joseph as HBI's President.  (Joseph Dep. 8:13–15.)

{20}   Drymax was formed on November 6, 2003.  (Blythe Dep. Ex. 102.)  The initial ownership was established as follows:  Blythe 40%; HBI 30%; Joseph 20%; Rob Bell 5%; and Virginia Bell 5%.  (Blythe Dep. Ex. 104.)

{21}   The membership percentages remained unchanged from January 2004 until January 2007.  In January 2007, HBI assigned its 30% membership interest in equal portions to Rob Bell and Virginia Bell.  (Rob Bell III Dep. Vol. I 36:3–18;

Virginia Bell Dep. 65:11–66:9.)  Rob Bell testified that he prepared new stock certificates reflecting the changes and sent them to Blythe to sign, and that Blythe signed them.  (Rob Bell III Dep. 167:12–20; Defs.' Mot. for Summ. J. Ex. G.)  Blythe denies that he signed the certificates.  (Blythe's Resp. Reqs. Admis. 31–32, attached to Defs.' Mot. for Summ. J. Ex. G.)  Neither Blythe nor Joseph otherwise have consented to the 2007 assignment in writing, and no member meeting was held regarding the assignment.  (Rob Bell III Dep. Vol. I 38:9–16, 39:13–15; Virginia Bell Dep. 68:10–17; Blythe Dep. 395:20–396:7, 443:2–13.)

{22}    In January 2008, Joseph resigned his office with HBI to become the President and Chief Operating Officer of Hibbett Sporting Goods, Inc. ("Hibbett"). (Rob Bell III Dep. Vol. I 8:18–9:5; Joseph Dep. 8:10–15, 15:25–16:3.)  Joseph then sold his 20% interest in Drymax to HBI.  (Rob Bell III Vol. I 40:16–41:15.)  There is no writing or member vote indicating the consent of the other members to this assignment.  (Virginia Bell Dep. 70:21–23, 74:5–8; Rob Bell III Dep. Vol. I 41:23–42; Blythe Dep. 398:21–399:3.)

## IV.    ANALYSIS

### A.    Standard of Review

{23}    Pursuant to N.C. R. Civ. P. 56(c) ("Rule 56"), a party is entitled to summary judgment if the record shows "that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law."  N.C. GEN. STAT. § 1A, Rule 56(c) (2001).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, which may be met by proving that an essential element of the opposing party's claim is nonexistent.  *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002).  If the movant successfully makes such a showing, the burden then shifts to the nonmovant to present specific facts establishing the

presence of a genuine factual dispute for trial. *Lowe v. Bradford*, 305 N.C. 366, 369–70, 289 S.E.2d 363, 366 (1982).

### B.   The Act's Provisions Relating to Assignment of Membership Interests

{24}   Unless otherwise provided in the articles of organization or the operating agreement of a North Carolina limited liability company, the Act's default provisions control. *Crouse v. Mineo*, 189 N.C. App. 232, 237, 658 S.E.2d 33, 36 (2008).

{25}   Plaintiffs earlier contended that a Drymax Operating Agreement was adopted, which Defendants denied. Plaintiffs now indicate that they do not seek to enforce an Operating Agreement. (Pls.' Resp. to Defs.' Mot. for Summ. J. (hereinafter "Pls.' Resp. Br.") 71.) The Parties then agree that the cross-motions are to be decided based on the Act's default provisions. (Pls.' Br. in Supp. of Mot. for Partial Summ. J. (hereinafter Pls.' Br. in Supp.) 11.; Defs.' Br. in Supp. of Their Mot. for Summ. J. as to Claims by William A. B. Blythe (hereinafter Defs.' Br. in Supp.) 10–12.)

{26}   Article 1 of the Act contains definitions, including the definition of a "membership interest," Article 3 controls admission of members and cessation of membership, and Article 5 governs assignment of membership interests and withdrawal. The Act has no drafter's comments and no meaningful legislative history to guide the court's interpretation.[4]

---

[4] The North Carolina Act was originally adopted prior to the Uniform Limited Liability Act of 1996 ("Uniform Act") and the Revised Uniform Limited Liability Act ("Revised Act"). Provisions in these acts related to membership interest assignment did not then inform the North Carolina Legislature. The Uniform Act provides that a member's transfer of all of its distributional interest is an event of dissociation causing the member to cease being a member. Unif. Ltd. Liab. Co. Act §§ 501–502 cmt. 1 (1996). Distributional interest by definition does not include management rights. *Id.* § 101(6). The Revised Act instead provides that a transferor retains the rights of a member other than the distributional interest and all duties and obligations of a member, and also allows a member to transfer governance rights to another existing member without obtaining consent from the other members, thus allowing control shifts among members. Revised Unif. Ltd. Liab. Co. Act § 502(g), § 502 cmt. 1 (2006); *See* Why States Should Adopt RULLCA, Uniform Law Commission (November 30, 2012), www.uniformlaws.org.

{27}     Section 57C-1-03 of the Act defines a "Membership interest or interest" as follows:

> all of a member's rights in the limited liability company, including any share of the profits and losses of the limited liability company, any right to receive distributions of the limited liability company assets, any right to vote on matters relating to the limited liability company, and any right to participate in the management of the limited liability company's affairs.

This definition recognizes the distinction between a member's economic interest and the member's control interest.

{28}     Section 57C-3-01(b) provides the procedure for admitting new members, and requires unanimous consent of the existing members. Section 57C-5-04(a) provides for the admission of an assignee as a member and also requires unanimous consent. As discussed below, the court determines that the Section 57C-5-04 procedures apply only to an assignee that is not already a member and not to one that is already a member.

{29}     Section 57C-3-01(c) allows a member to be admitted without owning any economic interest.

{30}     The Parties center their respective positions on Section 57C-5-02 which governs "assignment of membership interests." This section provides:

> Except as provided in the articles of organization or a written operating agreement, a membership interest is assignable in whole or in part. An assignment of a membership interest does not dissolve the limited liability company or entitle the assignee to become or exercise any rights of a member. An assignment entitles the assignee to receive, to the extent assigned, only the distributions and allocations to which the assignor would be entitled but for the assignment. Except as provided in the articles of organization or a written operating agreement, a member ceases to be a member upon assignment of all of his membership interest. Except as provided in the articles of organization or a written operating agreement, the pledge of, or granting of a security interest, lien, or other encumbrance in or against, all or any part of the membership interest of a member shall not cause the member to cease to be a member or the secured party to have the power to exercise any rights or powers of a member.

{31}    Section 57C-5-04(a) governs the "Right of assignee to become a member."  It provides:

> An assignee of (or other person having only the rights of an assignee under G.S. 57C-5-02 with respect to) an interest in a limited liability company may become a member only with that person's consent and:
> > (1)    By meeting the requirements provided in the articles of organization or operating agreement;
> > (2)    By the unanimous consent of the members, if the articles of organization or operating agreement do not provide otherwise; or
> > (3)    In the manner permitted under G.S. 57C-6-01(4), if the limited liability company ceases to have any members.
> The consent of a member may be evidenced as provided in the articles of organization or operating agreement. If the articles of organization or operating agreement do not provide otherwise, then consent is to be evidenced by a written instrument, dated and signed by the member, or evidenced by a vote taken at a meeting of members.

{32}    The Act also limits a member's right to terminate his membership. Section 57C-5-06 provides that a member cannot voluntarily withdraw unless allowed by the articles of incorporation or a membership agreement.  The Act provides no express procedure for voluntary withdrawal in the absence of such agreement.  The Act does provide for "cessation of membership" in circumstances of a more involuntary nature, such as insolvency, bankruptcy or assignment for the benefit of creditors.

{33}    It is clear by the wording of Section 57C-5-02 that an assignment in and of itself does not entitle the assignee to become a member or to exercise a member's rights if he is not already a member.  The court must determine first whether this Section precludes the assignment of a control interest without unanimous consent to one who is already a member; and second, as to an assignment to a non-member, whether the assignor is immediately upon assignment divested of any control right even though the assignee cannot exercise any control until admitted or rather instead continues to hold that control interest until the non-member assignee is admitted.

## C.    The Parties' Conflicting Interpretations

{34}    Plaintiffs contend that the Act allows the free transfer of both economic and control interests.  However, they contend that economic interests and control interests are treated differently, with both being transferred immediately upon assignment but the control interest, while transferred, cannot be exercised until there is unanimous member consent.  (Pls.' Resp. Br. 67.)  They contend that the member who assigns "all his interest," nevertheless immediately ceases to be a member, with the effect that the assigned control interest cannot be exercised by either the assignor or the assignee prior to unanimous member consent.  According to Plaintiffs, in the interim between the assignment and such unanimous consent, the percentage of control interests that may be actually exercised is less than 100%, so that the effective percentage control interest of other members is proportionally increased.  (Pls.' Resp. Br. 67–68, 78.)  Under this construction, a minority member can then obtain effective majority control while still owning only a minority share.  (Pls.' Resp. Br. 67.)  Plaintiffs contend that Blythe now has effective majority control of Drymax.

{35}    Defendants contend that the Act applies differently to assignments between members and assignments to a non-member.  They contend that the unanimous consent provisions of Section 57C-5-04 apply only to assignments to a non-member, and that any restriction on transfers between members must be provided in the articles of incorporation or an operating agreement.  Accordingly, they contend that HBI effectively transferred all of its interests to Rob and Virginia Bell without the need for unanimous member consent.  Such a transfer would cause HBI to cease being a member, so that Section 57C-5-04 would apply to Joseph's assignment to HBI.  Defendants contend that an assignor retains his control interest upon assignment to a non-member until admission of the non-member is approved, so that Joseph retains his control interest.  (Defs.' Opp'n Br. 10–12.)  Defendants contend that Blythe has held a consistent 40% control interest.

{36}    The Parties' respective positions can be represented by the following charts:

### Plaintiffs' Position:

After the 2007 Transfer, 30% of control interests cannot be exercised.

|  | Economic Interest | Effective Control Interest |
|---|---|---|
| Blythe | 40% | 57% (40% of 70%) |
| HBI | 0% | 0% (30% interest divested) |
| Joseph | 20% | 29% (20% of 70%) |
| Rob Bell | 20% | 7% (5% of 70%) |
| Virginia Bell | 20% | 7% (5% of 70%) |

And, after the 2008 Transfer, 50% of control interests cannot be exercised.

|  | Economic Interest | Effective Control Interest |
|---|---|---|
| Blythe | 40% | 80% (40% of 50%) |
| HBI | 20% | 0% (30% interest divested) |
| Joseph | 0% | 0% (20% interest divested) |
| Rob Bell | 20% | 10% (5% of 50%) |
| Virginia Bell | 20% | 10% (5% of 50%) |

### Defendants' Position:

After the 2007 Transfer, 100% of control interests can be exercised.

|  | Economic Interest | Effective Control Interest |
|---|---|---|
| Blythe | 40% | 40% |
| HBI | 0% | 0% |
| Joseph | 20% | 20% |
| Rob Bell | 20% | 20% |
| Virginia Bell | 20% | 20% |

And, after the 2008 Transfer, 100% of control interests can be exercised.

|  | Economic Interest | Effective Control Interest |
|---|---|---|
| Blythe | 40% | 40% |
| HBI | 20% | 0% |
| Joseph | 0% | 20% |
| Rob Bell | 20% | 20% |
| Virginia Bell | 20% | 20% |

## D.    The Court's Statutory Construction

{37}    "Statutory interpretation properly begins with an examination of the plain words of the statute." *Correll v. Div. of Soc. Servs.*, 332 N.C. 141, 144, 418

S.E.2d 232, 235 (1992). "The intent of the Legislature controls the interpretation of a statute." *State v. Joyner*, 329 N.C. 211, 217, 404 S.E.2d 653, 657 (1991). If the statute is clear and not ambiguous, the court must implement it according to the plain meaning of its terms. *Hyler v. GTE Prods. Co.*, 333 N.C. 258, 262, 425 S.E.2d 698, 701 (1993). If clear and unambiguous there is no room for judicial construction. *Lemons v. Old Hickory Council, Boy Scouts of America, Inc.*, 322 N.C. 271, 276, 367 S.E.2d 655, 658 (1988). "A part of a statute may not be interpreted out of context so as to render it inharmonious to the intent of the act, but must be construed as part of the whole." *Rent-A-Car Co. v. Lynch*, 298 N.C. 559, 562–563, 59 S.E.2d 564, 566–567 (1979) (quoting *Canteen Serv. v. Johnson Comm. of Revenue*, 256 N.C. 155, 160, 123 S.E.2d 582, 585 (1961)). Conversely, when the language is ambiguous, the court must determine the purpose of the statute and the intent of the legislature in its enactment. *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980). "The best indicia of [the legislature's] intent are the language of the statute or ordinance, the spirit of the act and what the act seeks to accomplish." *Id.* "In the construction of any statute . . . words must be given their common and ordinary meaning, nothing else appearing." *In re Clayton-Marcus*, 286 N.C. 215, 219, 210 S.E.2d 199, 203 (1974).

{38}    Here, the Act created a statutory form of business organization that combines the characteristics of limited liability from business corporations, and pass through taxation from partnerships. 1 Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 34.01 (2012). While the drafters of the Act may have considered provisions of other acts with more specific and extensive statutory regimes, LLC's are fundamentally contractual in nature, and the Act provides only default provisions of a more limited scope and which in most instances can be varied by articles of organization or operating agreements. *Id.*

{39}    It is clear that the Legislature allowed for the assignment of membership interests, in whole or part, and recognized a distinction between economic and control interests. The Legislature also clearly recognized a distinction between an assignee and a member.

{40}  In determining the effect of the assignments on the control interests, the court must strive to reconcile and give meaning to all of the Act's provisions. The court is confronted with a potential conflict between two phrases within Section 57C-5-02. One restrictively states that an assignee "*receives* only the distributions and allocations to which the assignor would be entitled but for the assignment" (emphasis added). The other provides that "a member ceases to be a member upon assignment of *all of his membership interest*." (emphasis added). The question is whether Plaintiffs are correct that the Act allows for the control interest to be received by the assignee even though it cannot be exercised, with the result that the assignor member is immediately upon assignment divested of all rights of a member.

{41}  Plaintiffs correctly caution that the court cannot import words into the statute that change the meaning intended by the Legislature. More specifically, Plaintiffs contend that the court cannot change the statutory term of "assignment" to "effective assignment." They contend that the court must enforce the clear statutory language that provides that the assignments immediately caused the assignor to cease being a member. However, by the same token, the court cannot add language to the Act to allow an assignee to hold an inchoate control right and cannot ignore the restriction that the assignee receives only economic rights.

{42}  There are certain practical effects that flow from Plaintiffs' construction. First, absent unanimous member approval, the control interests of the LLC are realigned upon the assignment in such a way to increase the proportional rights of members not involved in the assignment. Second, the assignor immediately loses all member rights and can only be restored by being readmitted by unanimous consent. The assignor then has no power to correct any deficiency in the assignment or participate in any decision seeking member approval.

{43}  Plaintiffs' construction would give an existing member an effective veto over any transfer of a member's control interest, whether to an existing member or to a non-member. Plaintiffs contend that this is, however, fully consistent with

North Carolina's entrenched policy protecting minority shareholders. Defendants in contrast contend that Plaintiffs' construction unfairly creates a trap for the unwary and creates immediate control shifts the Legislature did not contemplate. They contend their construction maintains the status quo pending member consent and fairly and adequately protects all members by allowing transfers among those voluntarily admitted as members but restricting any transfer to a non-member without unanimous consent.

{44}    In applying its construction, the court has sought to give effect to all of the Act's various provisions. It interprets the Act to allow members, absent a contrary agreement, to transfer both their economic and control membership interests to existing members without unanimous member consent. The court finds that Plaintiffs' construction providing otherwise would conflict with Section 57C-5-06 which prohibits a member from voluntarily withdrawing if there is no express member agreement allowing this withdrawal, because under Plaintiffs' construction, a member could voluntarily assign all his interest and immediately cease being a member without the need for any other member's consent. Section 57C-5-06 demonstrates that the Legislature intended just the opposite. The court cannot find a fair reading of the Act, reconciling all its provisions, that reflects a legislative purpose that allow a member to cease being a member leaving his prior control interest inchoate.

{45}    The court then concludes that, under the default provisions of the Act, a member assignor ceases to be a member under Section 57C-5-02 once his entire interest is assigned, such assignment is immediately complete upon assignment as between existing members without the need for further member consent, but as to an assignment to a non-member, the assignor does not cease being a member until the assignee is admitted pursuant to the provisions of Section 57C-5-04.

{46}    The court recognizes there are policy arguments that can be made as to which statutory construction best protects minority owners. But these policy arguments do not provide a basis to apply the Act differently than it is written. Again, the court notes that the Legislature gave members great latitude to allocate

their various interests by agreement. In the absence of their having done so, the default provisions of the Act control. The court believes it has applied the various provisions of the Act in the manner necessary to reconcile its various provisions that might otherwise be inconsistent.

{47}    As noted, the court has based its analysis to the statutory language. Its construction was not influenced by subsequent uniform acts or subsequent case or statutory developments in other states. The court notes for interest only decisions from other states discussed in the Parties' briefs. In *Achaian Inc. v. Leemon Family LLC*, the Delaware Chancery Court was asked to decide whether a member can transfer his entire interest, including voting rights, to an existing member. 25 A.3d 800, 2011 De. Ch. LEXIS 118 (2011). The Court based its holding on provisions of an operating agreement rather than default statutory provisions, and held that the member could transfer his entire interest without consent of the members. In *Spurlock v. Begley*, the court was asked to apply the Kentucky statute that includes express provisions which provide that, if an assignment is effective only to transfer the assignor's economic rights, but not its control rights, the assignor remains a member and retains all management rights. 308 S.W.3d 657, 658–60 (Ky. 2010). Likewise, the Pennsylvania LLC Act apparently provides that a member's assignment transfers his economic interest without the need for member consent, but in the absence of such consent, the control interest remains with the assignor member. *See Zokaites v. Pittsburgh Ir. Pubs, LLC*, 962 A.2d 1220 (Pa. Super. Ct. 2008).

## E.    The Two Transfers

{48}    HBI, Rob Bell, and Virginia Bell were each members at the time of HBI's 2007 assignment. The court concludes that this assignment was effective to transfer HBI's economic and control interests to Rob and Virginia Bell as existing members without the necessity of consent from Blythe or Joseph. The court also concludes that HBI ceased to be a member upon the assignment.

{49}    The court's decision does not rest on finding that Blythe consented to the assignment.  In that regard, the court does not believe that the stock certificates executed after the assignment would be adequate evidence of consent, if consent were required.

{50}    HBI was no longer a member in 2008 when Joseph assigned his membership interests to HBI.  Accordingly, the court concludes that unless and until the other members unanimously consent to admit HBI as a member, HBI has received only Joseph's economic interest and Joseph remains a member with his control interest.

{51}    In summary, applying the statute to the uncontested facts, the court finds as a matter of law that:

1.    The 2007 HBI assignment to Rob Bell and Virginia Bell was effective to transfer HBI's full membership interest, including economic, voting and management rights, without the necessity of further consent or action by other members, and as such, the assignment caused HBI to cease being a member in Drymax;

2.    The 2008 Joseph assignment to HBI effectively transferred only Joseph's economic interest to HBI, while Joseph's voting and membership rights remain with Joseph unless and until HBI is admitted as an assignee member by unanimous consent;

3.    After the 2007 HBI assignment and prior to the 2008 Joseph assignment, the economic and control interests in Drymax were as follows:

|  | Economic Interest | Control Interest |
|---|---|---|
| Blythe | 40% | 40% |
| HBI | 0% | 0% |
| Joseph | 20% | 20% |
| Rob Bell | 20% | 20% |
| Virginia Bell | 20% | 20% |

4.    After the 2008 Joseph assignment the economic and control interests in Drymax are as follows:

|  | Economic Interest | Control Interest |
| --- | --- | --- |
| Blythe | 40% | 40% |
| HBI | 20% | 0% |
| Joseph | 0% | 20% |
| Rob Bell | 20% | 20% |
| Virginia Bell | 20% | 20% |

## V.    CONCLUSION

{52}    Accordingly, Plaintiffs' Motion for Partial Summary Judgment insofar as it addresses the effect of the membership interest transfers is DENIED. Defendants' Motion for Summary Judgment as to Blythe's claims insofar as it addresses the effect of the membership interest transfers is GRANTED.  The court reserves ruling on other issues raised by the respective motions not specifically addressed by this Order.

IT IS SO ORDERED, this 10th day of December, 2012.